**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HOUSE OF BRIDES, INC., HOUSE OF BRIDES WORLD'S LARGEST ONLINE WEDDING STORE, INC., HOB HOLDING CORPORATION, AND HOB I HOLDING CORPORATION, | ) ) ) ) ) | No. 11 C 07834 |
| | ) | |
| Plaintiffs, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| v. | ) | |
| | ) | |
| ALFRED ANGELO, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiffs, House of Brides, Inc., House of Brides World's Largest Online Wedding

Store, Inc., HOB Holding Corporation, and HOB I Holding Corporation (collectively, "House of

Brides"),[1] filed suit against Defendant Alfred Angelo, Inc. ("Alfred Angelo"), for breach of

contract, breach of implied warranty of merchantability, violations of federal and state antitrust

law, and tortious interference with the plaintiffs' business expectancy. Pending now is Alfred

Angelo's motion to dismiss the antitrust and tortious interference claims pursuant to Rule

12(b)(6). For the reasons that follow, Alfred Angelo's motion is granted.

## BACKGROUND

The following facts, taken from the First Amended Complaint, are accepted as true for

the purposes of this motion. *Navarro v. Neal*, 716 F.3d 425, 429 (7th Cir. 2013). Alfred Angelo

---

[1] For simplicity, the Court refers to the plaintiffs as one entity; House of Brides therefore takes the singular form throughout the opinion.

is a corporation that designs, manufactures, brands, and distributes a variety of products for weddings, including bridal gowns and bridesmaid dresses. Am. Compl. ¶¶ 11, 35. House of Brides purchases, markets, and sells bridal gowns and bridesmaid dresses both in brick-and-mortar stores and online. *Id.* ¶¶ 9, 42. Since 2002, House of Brides has become a "premier online retailer of wedding products." *Id.* ¶ 42. House of Brides was among the first such companies to publish retail prices for its products online, allowing consumers to comparison shop. *Id.* ¶ 43. House of Brides also offers weddings products at prices substantially below prices charged by "most, if not all of, their competitors." *Id.* ¶ 44. For more than forty years, House of Brides was an authorized dealer of Alfred Angelo products. *Id.* ¶ 46. In that role, House of Brides purchased, marketed, and sold Alfred Angelo bridal gowns and bridesmaid dresses. *Id.* ¶ 12. Both parties profited from this relationship. Alfred Angelo wedding products became one of the best-selling and most profitable lines sold by House of Brides, and House of Brides became Alfred Angelo's top retailer in the United States. *Id.* ¶¶ 47, 52. House of Brides had gross sales revenues of approximately $1 million, $1.3 million, and $1.7 million for Alfred Angelo wedding products in 2009, 2010, and 2011, respectively. *Id.* ¶ 48. The majority of House of Brides sales transactions for Alfred Angelo products took place online. *Id.* ¶ 47.

As an authorized dealer, House of Brides purchased Alfred Angelo products via special order and purchased a required minimum stock twice a year. *Id.* ¶ 47. Some of the House of Brides purchase orders specified a date for delivery. *Id.* ¶ 14. On numerous occasions, Alfred Angelo failed to meet this date and the affected customers refused to accept the dress, causing House of Brides to lose the sale. *Id.* On other occasions, the delay damaged the relationship between House of Brides and its customers. Additionally, Alfred Angelo shipped duplicate,

incorrect, or defective orders to House of Brides, forcing House of Brides to pay for dresses that had not been ordered by a customer. *Id.* ¶¶ 15–17. According to House of Brides, certain dresses that were supplied to it by Alfred Angelo were not of fair or average quality and would not pass without objection in the trade under the contract description. *Id.* ¶ 26.

Until recently, Alfred Angelo was "strictly a designer and manufacturer," but now Alfred Angelo also operates retail stores throughout the United States. *Id.* ¶ 50. Upon its expansion into operating retail stores, Alfred Angelo became a direct competitor to House of Brides. *Id.* ¶ 51.

On January 1, 2004, Alfred Angelo announced marketing policies, including a mandatory minimum retail pricing policy. *Id.* ¶ 53. Alfred Angelo's mandatory minimum retail pricing policy solicited "agreement from retailers not to discount [Alfred Angelo] products" below the policies' minimum prices and threatened to terminate retailers who did not comply. *Id.* ¶ 53. House of Brides was not aware of Alfred Angelo's marketing policies until January 2007. *Id.* ¶ 54. On April 18, 2007, Alfred Angelo sent House of Brides a letter notifying it of the marketing policies that had been introduced in January 2004. *Id.* ¶ 54. At the same time, Alfred Angelo also notified House of Brides that failure to comply with the minimum retail pricing policies would result in termination of its status as an authorized Alfred Angelo dealer. *Id.* ¶ 56. House of Brides rejected Alfred Angelo's mandatory minimum prices, stating that other retailers were selling at discounted prices and that House of Brides needed to remain competitive. *Id.* ¶ 55. The Chief Financial Officer of Alfred Angelo reported receiving complaints from other customers of Alfred Angelo regarding the refusal of House of Brides "to abide by the minimum resale price." *Id.* ¶ 52. These complaints included threats to stop purchasing from Alfred Angelo

unless House of Brides met the agreed minimum prices or until Alfred Angelo stopped supplying products to House of Brides.

Alfred Angelo implemented a new set of marketing policies on November 24, 2010. *Id.* ¶ 58. The 2010 policies set forth both a Manufacturer's Suggested Retail Price ("MSRP") and a Minimum Pricing Policy ("MPP"). *Id.* ¶ 58. The MSRP represented the expected retail price for online sales while the MPP represented the minimum price for products sold at brick-and-mortar stores. *Id.* ¶ 58. House of Brides alleges that Alfred Angelo and its retail dealers deliberately established these policies to "unreasonably restrain prices." *Id.* ¶ 59. House of Brides also alleges that Alfred Angelo set its MSRP substantially higher than its MPP, thus prohibiting the plaintiffs from competing with retail stores. *Id.* ¶ 60. On December 20, 2010, Alfred Angelo solicited House of Brides via email for confirmation of its agreement to Angelo's new marketing policies. *Id.* ¶ 61. Once again, however, House of Brides informed Alfred Angelo that it would not agree to the minimum pricing policies. *Id.* ¶ 61. At that time, numerous other online distributors of Alfred Angelo products both advertised and sold Alfred Angelo products below the MSRP and MPP, including Dress for Less, E Bridal Superstore, Prom Save, and Plus Size Bridal. *Id.* ¶ 63.

Alfred Angelo sent House of Brides another e-mail on or about May 4, 2011, containing notification that Alfred Angelo would cease supplying House of Brides with bridesmaid dresses on April 30, 2011. *Id.* ¶ 64. House of Brides alleges that Alfred Angelo sent this termination letter due to pressure placed on it by competitors of House of Brides, including Alfred Angelo's own retail stores, demanding that Alfred Angelo compel House of Brides to comply with its minimum prices. *Id.* ¶ 64. At this time, however, even Alfred Angelo sold its own products below the 2010 MPP. According to the First Amended Complaint, Alfred Angelo was seeking to

"enhance its own retail sales" at the expense of House of Brides; its policies were even designed to drive House of Brides out of business. *Id.* ¶¶ 65, 86. After the May 2011 email request, House of Brides continued to discount Alfred Angelo products; Alfred Angelo then terminated its relationship with House of Brides on August 12, 2011. *Id.* ¶ 66.

As a result of this termination, House of Brides alleges that it is left with retail store samples of Alfred Angelo products that it had been required to purchase but on which it cannot now take orders. *Id.* ¶ 18. House of Brides estimates that it has lost in excess of $285,000, including stock inventory, customer returns, duplicate orders, and customer cancellations. *Id.* ¶ 19. House of Brides claims that it has been rendered unable to fill existing orders and unable to enter into new contracts with individuals inquiring prospectively about Alfred Angelo products. *Id.* ¶ 68. Finally, House of Brides alleges that Alfred Angelo's conduct has resulted in artificially high prices for consumers and a lack of competition for Alfred Angelo products. *Id.* ¶ 67.

House of Brides filed suit against Alfred Angelo in the Circuit Court of Cook County, Illinois, on October 7, 2011, alleging claims for breach of contract, breach of warranty, and seeking a declaratory judgment of its rights. Dkt. 1-1. Alfred Angelo removed the action to this Court on the basis of diversity jurisdiction and filed an answer and counterclaims. Dkt. 6. On December 21, 2012, House of Brides was permitted to file a First Amended Complaint alleging additional claims for violations of the Sherman Act, the Robinson-Patman Act, Illinois antitrust law, and tortious interference with the plaintiffs' business expectancy, in addition to the contract and warranty claims. Dkt. 47. Alfred Angelo now moves to dismiss the antitrust and tortious interference claims (Counts IV, V, VI, and VII) from the First Amended Complaint.

**DISCUSSION**

At the heart of the pending motion is the proper scope of this dispute. Alfred Angelo argues that House of Brides has not pleaded plausible antitrust claims and that the suit is properly characterized as a "simple collection case." Def.'s Mot. 1, Dkt. 49. House of Brides argues that Alfred Angelo's conduct reduced competition in the market for Alfred Angelo wedding products by forcing consumers to pay artificially high prices, and that it was unable to fill existing customer orders or convert prospective customer inquiries into orders. Am. Compl. ¶¶ 40, 67. 68.

A Rule 12(b)(6) motion to dismiss "challenges the sufficiency of the complaint to state a claim upon which relief may be granted. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive a motion to dismiss, a complaint must include enough factual detail to give the defendant fair notice of the claims and grounds upon which they rest, and the allegations must add up to a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. v. Twombly*, 550 U.S. 544, 545, 555–57, 570 (2007); *Engel v. Buchan*, 710 F.3d 698, 709 (7th Cir. 2013). To make out a claim that is plausible, plaintiffs must allege enough factual matter, taken as true, to "raise a right to relief above the speculative level" and "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570. In making this determination, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the plaintiff, but does not accept as true a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 679; *Navarro*, 716 F.3d at 429. Formulaic recitation of the elements of a cause of action supported by conclusory statements will not suffice. *Iqbal*, 556 U.S. at 678 (citing *Twombly,* 550 U.S at 555); *Tamburo v. Dworkin*, 601 F.3d 693, 699 (7th Cir. 2010) (affirming the dismissal of antitrust

claims that were "pleaded in a wholly conclusory fashion" so as to "sweep in the entire gamut of federal antitrust violations"). Determining the plausibility of a complaint is a "context-specific task" that requires the Court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## I.     Count IV: Sherman Act Claim

In Count IV of the First Amended Complaint, House of Brides alleges that Alfred Angelo's conduct constitutes a violation of § 1 of the Sherman Act, which prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Despite its expansive text, it is well-settled that § 1 of the Sherman Act proscribes only unreasonable restraints of trade. *See American Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 189 (2010) ("[E]ven though, 'read literally,' § 1 would address 'the entire body of private contract,' that is not what the statute means."); *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

The reasonableness of many forms of agreements in restraint of trade is evaluated under a flexible, fact-specific rule of reason analysis. *See Standard Oil Co. v. United States*, 221 U.S. 1, 58–62 (1911) (adopting the rule of reason); *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). In a rule of reason analysis, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977). The essence of the rule of reason is that it "requires a plaintiff to show that the challenged restraint has adversely impacted competition in the relevant market." *42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401, 404 (7th Cir. 2002) (citations omitted). "In its design and function the rule distinguishes between restraints with anticompetitive effect that are

harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). The rule of reason is the "accepted standard" for determining whether a challenged practice violates § 1 of the Sherman Act and the Supreme Court has explicitly held that it applies to vertical minimum resale price maintenance agreements. *Id.* at 885 (overruling *Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911)); *see also Jacobs v. Tempur–Pedic Int'l, Inc.,* 626 F.3d 1327, 1333 (11th Cir. 2010) (affirming dismissal of a complaint based on vertical resale price maintenance agreements).

Other forms of agreements are deemed *per se* violations of §1 of the Sherman Act. "The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work." *Leegin*, 551 U.S. at 886 (citing *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)). "*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" *Texaco Inc.*, 547 U.S. at 5 (quoting *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). Application of the *per se* rule is therefore limited to restraints "that would always or almost always tend to restrict competition and decrease output," or in other words, restraints with "manifestly anticompetitive" effects without any redeeming virtue. *Leegin*, 551 U.S. at 886 (citations omitted). The *per se* rule applies to, *inter alia,* horizontal agreements among competitors to fix prices. *Id.*

To adequately allege a § 1 violation, a plaintiff must allege three elements: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant

market; and (3) an accompanying injury." *Agnew*, 683 F.3d at 335, 338 n.4 (alteration in original) (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)). Alfred Angelo contends that House of Brides fails to plead horizontal agreements or conspiracies (thus failing to trigger the *per se* rule), fails to allege any basis for finding Alfred Angelo's vertical agreements to be unreasonable (thus failing to sufficiently allege a § 1 violation under a rule of reason analysis), and fails to identify a relevant product market (thus failing to sufficiently state a claim for a Sherman Act violation). House of Brides alleges that Alfred Angelo unreasonably restrained trade by entering into minimum resale price agreements with retail distributors for its branded products and by terminating its relationship with House of Brides for failure to comply with those pricing policies. Am. Compl. ¶¶ 58–60, 62.

As an initial matter, and counter to what House of Brides pleads, the *per se* rule is inapplicable to the alleged agreements in this case. As described, Alfred Angelo is both a manufacturer and retail distributor of its products. *Id.* ¶¶ 50, 65. That is, Alfred Angelo operates a dealership on the same market level as one or more of its customers in what is commonly referred to as a "dual distribution" system. *See Davis-Watkins Co. v. Serv. Merch.*, 686 F.2d 1190, 1201 n.14 (6th Cir. 1982) (defining dual distribution), *overruled in part on unrelated grounds by Bailey's, Inc. v. Windsor Am., Inc.*, 948 F.2d 1018, 1029 n.5 (6th Cir. 1991). Restraints in dual distribution systems are analyzed under the rule of reason. *Ill. Corporate Travel, Inc. v. Am. Airlines, Inc.*, 889 F.2d 751, 753 (7th Cir. 1989), *cert. denied*, 495 U.S. 919 (1990); *see also PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 2009 WL 938561 at *6 n.1

(E.D. Tex. 2009) (collecting circuit cases applying the rule of reason to dual distribution systems), *aff'd*, 615 F.3d 412 (5th Cir. 2010).[2]

The second element encompasses two key issues: the boundaries of the alleged relevant market and the reasonableness of the alleged agreements. Turning to the product market argument first, "[f]ailure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719-20 (6th Cir. 2003) (quoting *Tanaka v. Univ. of S. Calif.*, 252 F.3d 1059, 1063 (9th Cir. 2001)). To establish a relevant market, a plaintiff must define both a geographic market and a product market. *See Republic Tobacco Co. v. N. Atl. Trading Co.,* 381 F.3d 717, 738 (7th Cir. 2004); *see also Jacobs*, 626 F.3d at 1336; *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010). Alfred Angelo does not challenge the assertion of the United States as the relevant geographic market, Am. Compl. ¶ 41, therefore the Court first considers whether House of Brides has plausibly alleged a relevant product market.

It is the use or uses to which the product is put that controls the boundaries of the relevant market. *United States v. E.I. DuPont deNemours & Co.*, 351 U.S. 377, 396 (1956). A relevant product market is defined as the line of goods or services that are reasonably interchangeable in use for the same purposes. *Id.* This determination involves assessing whether the product is "unique" or has "close substitutes, as to which there are substantial cross-elasticities of demand." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 531 (7th Cir. 1986); *see Jacobs*, 626 F.3d at 1337–38

---

[2] Furthermore, to the extent that Alfred Angelo owns its own retail stores, it cannot be said to have conspired horizontally with those stores in its role as a manufacturer. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984) (holding that "conspiracy" does not cover an agreement between a wholly owned subsidiary and its parent because the two have a "complete unity of interest").

& n.13 ("The cross-elasticity of demand measures the change in the quantity demanded by consumers of one product relative to the change in price of another.").

In the view of House of Brides, the Alfred Angelo brand is the market. House of Brides specifically alleges that the relevant product market influenced by Alfred Angelo's actions is "[Alfred Angelo] wedding products, and specifically bridal gowns and bridesmaid dresses that are marketed either online through Internet retail sites or through 'brick and mortar' retail stores." Am. Compl. ¶ 40. Alfred Angelo argues that House of Brides' allegations are merely conclusory statements that parrot the elements of an antitrust violation. It argues that House of Brides fails to allege sufficient factual detail to support a cognizable single-brand product market for wedding products carrying the Alfred Angelo brand.

The law usually requires that a relevant product market for antitrust purposes comprise more than a single brand. *Leegin,* 615 F.3d at 418. This requirement stems from the principle that antitrust law serves to protect competition, not competitors. *See 42nd Parallel N.*, 286 F.3d at 405 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). Put another way, "the primary purpose of the antitrust laws is to protect interbrand competition." *State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997). The Eleventh Circuit has elaborated:

> [E]liminating intrabrand competition frees retailers to invest in enhanced services that more effectively sell the manufacturer's products relative to rival manufacturers' products. Additionally, customers receive more opportunities to choose among cheaper, lower-quality brands and more expensive, higher-quality brands. Furthermore, absent vertical price restraints, the retail services that enhance interbrand competition might be underprovided. This is because discounting retailers can free ride on retailers who furnish services and then capture some of the increased demand those services generate.

11

*Jacobs*, 626 F.3d at 1335 (alterations and citations omitted); *see also GTE Sylvania*, 433 U.S. at 52 n.19 (noting that interbrand competition limits "the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product").

House of Brides calls Alfred Angelo's products "highly differentiated" and "unique." Am. Compl. ¶¶ 36, 38. It further characterizes products carrying the Alfred Angelo brand as having "an inelasticity of demand, and little cross-elasticity of demand between AA-brand products and demand for competing products." *Id.* ¶ 39. It supports its single-brand theory by alleging that many customers "do not consider other accessories suitable substitutes," nor would customers substitute other accessories for Alfred Angelo products even in the face of a "significant, non-transitory increase in the price" of Alfred Angelo brand products. *Id.* ¶ 38.

Such spare assertions of consumer preferences fall short of rendering it plausible that there exist no interchangeable substitutes for Alfred Angelo's products. Similar allegations of consumer preference in single-brand cases have failed to help establish plausible claims before other courts. *See, e.g.*, *Spahr v. Leegin Creative Leather Prods., Inc.*, 2008 WL 3914461 at *9– 10 (E.D. Tenn. 2008) ("While Brighton-brands may enjoy some market loyalty, it cannot reasonably be argued that other handbags, wallets, shoes, jewelry and the like do not serve the same purpose and have the same use as Brighton-brand products."); *Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.,* 960 F. Supp. 701, 705 (S.D.N.Y. 1997) ("The plaintiff's argument is analogous to a contention that a consumer is 'locked into' Pepsi because she prefers the taste, or NBC because she prefers 'Friends,' 'Seinfeld,' and 'E.R.' A consumer might choose to purchase a certain product because the manufacturer has spent time and energy differentiating his or her creation from the panoply of products in the market, but at base, Pepsi

is one of many sodas, and NBC is just another television network."). "[N]aked assertion[s]" may bring a complaint close to stating a claim, but "without some further factual enhancement it stops short of the line between possibility and plausibility." *Twombly,* 550 U.S. at 555. These conclusory allegations, resting on House of Brides' assertions that Alfred Angelo products are so "unique" and "highly differentiated" as to render other brands unsuitable substitutes, fall short of plausibly drawing the boundaries of the relevant product market around a single brand. This Court is not bound to accept these legal conclusions couched as factual allegations as true. *Iqbal*, 556 U.S. at 678.

All of this is not to say that a single brand may never constitute a relevant product market. Courts have allowed such claims to proceed in rare circumstances where the nature of the product locks consumers into a specific brand. In support of its argument, House of Brides cites *Eastman Kodak Co. v. Image Technical Services, Inc.*, in which the Supreme Court held that customers were effectively "locked in" to the market for Kodak brand services due to structural barriers and the commercial realities faced by consumers using Kodak equipment. 504 U.S. 451, 461–79, 482 (1992). In *Eastman Kodak*, the plaintiffs were independent service organizations who serviced Kodak equipment and sold Kodak parts. Kodak, the defendant, offered similar (competing) services. Kodak adopted policies limiting the sale of Kodak replacement parts to "buyers of Kodak equipment who use Kodak service or repair their own machines," effectively limiting the plaintiffs' access to Kodak parts; this troubled their businesses because Kodak equipment was not compatible with other manufacturers' equipment. *Id.* at 456–57. The plaintiffs alleged that Kodak violated § 1 of the Sherman Act with illegal tying practices and violated § 2 of the Sherman Act through its unlawful monopolization and

attempted monopolization of the market for Kodak parts. *Id.* at 458. The Supreme Court rejected

Kodak's argument that monopoly power did not exist because a single brand of a product cannot

constitute a relevant product market under the Sherman Act, stating:

> Because service and parts for Kodak equipment are not interchangeable with
> other manufacturers' service and parts, the relevant market from the Kodak
> equipment owner's perspective is composed of only those companies that service
> Kodak machines. This Court's prior cases support the proposition that in some
> instances one brand of a product can constitute a separate market.

*Id.* at 482 (citations omitted).

The allegations in this case are not remotely analogous to those in *Eastman Kodak*.

House of Brides does not allege that consumers are for any reason unable to choose wedding

dresses produced by competitors to the Alfred Angelo brand, nor can it plausibly suggest that

they cannot. Its bald assertion that Alfred Angelo "occupies a dominate [sic] position as supplier

to bridal stores" and "has market power" is too tautological to bolster its claim—having already

defined the product market as comprised of only Alfred Angelo products, such a characterization

cannot be independently derived and it does nothing to enhance the allegations to support the

conclusion that a single-brand market is plausible. Am. Compl. ¶¶ 36–37; *see Jacobs*, 626 F.3d

at 1338 (finding allegations of uniqueness without factual allegations to support a lack of cross-

elasticity of demand insufficient); *Spahr*, 2008 WL 3914461 at *9–10; *Global Discount Travel

Servs.,* 960 F. Supp. at 705. House of Brides has failed to plausibly suggest that the commercial

realities facing consumers prevent them from simply choosing another brand of bridal gown or

bridesmaid dress. The choices available to consumers planning weddings clearly encompass

products interchangeable for those carrying the Alfred Angelo label.

Since the complaint fails to allege a plausible relevant product market to establish a claim

for a Sherman Act violation, this Court need not examine whether House of Brides has

adequately pleaded other elements.[3] The failure to identify a relevant product market is fatal to Count IV of the First Amended Complaint; Count IV is accordingly dismissed.

## II.    Count VI: Illinois Antitrust Act Claim

Count VI incorporates the allegations made in support of the federal antitrust claims to assert a violation of the Illinois Antitrust Act. Am. Compl. ¶ 80; 740 Ill. Comp. Stat. 10/3(2). Alfred Angelo argues that because the Count VI state antitrust claim is based entirely on the incorporated assertions alleged in support of the Count IV Sherman Act claim, it too must fail.

The Illinois Antitrust Act instructs that where the wording of the Act is identical or similar to that of a federal antitrust law, Illinois courts should look to federal courts' constructions of that federal law as a guide when construing the state statute. 740 Ill. Comp. Stat. 10/11. The relevant section of the state statute provides that a person who "by contract, combination, or conspiracy" "unreasonably restrain[s] trade or commerce" violates state antitrust law. 740 Ill. Comp. Stat. 10/3(2). Illinois courts have recognized that this language closely resembles § 1 of the Sherman Act, thus the provision is interpreted in light of applicable federal precedent. *See Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954, 966 (N.D. Ill. 2007) (citing *Laughlin v. Evanston Hosp.,* 133 Ill. 2d 374, 384, 550 N.E. 2d 986, 990 (1990)). "[T]he

---

[3] It bears noting that the Supreme Court has touted the potential competitive benefits of vertical agreements to maintain minimum resale prices, stating that the practice "can stimulate interbrand competition—the competition among manufacturers selling different brands of the same type of product—by reducing intrabrand competition—the competition among retailers selling the same brand." *Leegin*, 551 U.S. at 890. "[E]very one of the potentially anticompetitive outcomes of vertical arrangements depends on the uniformity of the practice." Frank H. Easterbrook, *Vertical Arrangements and the Rule of Reason*, 53 Antitrust L.J. 135, 162 (1984). So, while it is not necessary in this case to decide whether the alleged agreements were plausibly unreasonable because House of Brides has not successfully alleged a relevant product market, precedent and prevailing economic theory indicate that the practice of setting minimum resale prices is not, in fact, as "shocking" as House of Brides claims it to be. Am. Compl. ¶ 45.

Illinois Antitrust Act claim will stand or fall with the Sherman Act claim . . . ." *Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, 13 C 1129, 2013 WL 4599903, at *3 n.1 (N.D. Ill. Aug. 29, 2013). House of Brides offers no argument for liability under state antitrust law apart from its arguments relating to the Sherman Act claim, so the Count VI is dismissed on the same basis.

### III.    Count V: Robinson-Patman Act Claim

The Robinson-Patman Act of 1936, also known as the Anti-Price Discrimination Act, codified as part of the Clayton Act at 15 U.S.C. § 13, prohibits anticompetitive price discrimination. In Count V, House of Brides asserts that Alfred Angelo violated Section 2(a), which makes it "unlawful . . . to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly . . . ." 15 U.S.C. § 13(a). Alfred Angelo argues that the allegations in the First Amended Complaint are too vague to state how Alfred Angelo's actions violate the Robinson-Patman Act. Def.'s Mot. 12, Dkt. 49.

Under the Robinson-Patman Act, "price discrimination" means "price difference." *Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 558 (1990) (quoting *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 549 (1960)). Price discrimination claims generally fall into three categories: primary line, secondary line, and tertiary line. *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176 (2006); *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 513, 521–22 & n.2 (7th Cir. 2011). "Primary-line cases entail conduct—most conspicuously, predatory pricing— that injures competition at the level of the discriminating seller and its direct competitors." *Volvo Trucks*, 546 U.S. at 176 (citations omitted). In primary line cases, "the gravamen is that the aggressor sold goods for too little money, hoping to cripple or discipline rivals so that it might

sell its wares for a monopoly price later, recouping the losses and adding a hefty profit, to the detriment of consumers." *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1399 (7th Cir. 1989). Secondary-line cases involve price discrimination that injures competition among the seller's "favored" and "disfavored" purchasers. *Volvo Trucks*, 546 U.S. at 176 (citations omitted). The "hallmark" of a secondary-line price discrimination injury "is the diversion of sales or profits from a disfavored purchaser to a favored purchaser." *Id.* at 177. "Tertiary-line cases involve injury to competition at the level of the purchaser's customers." *Id.* at 176. House of Brides alleges that Alfred Angelo (1) treated its own retail stores differently than other retail stores and (2) treated online retailers differently than brick-and-mortar stores. *See* Am. Compl. ¶¶ 60, 76–77. The essence of this claim is that House of Brides was treated differently than Alfred Angelo's favored purchasers, meaning this case involves a secondary-line claim.

To state a secondary-line price discrimination claim under the Robinson-Patman Act, Plaintiffs must allege: (1) a seller made at least two relevant sales in interstate commerce; (2) the products sold were of like grade and quality; (3) the seller discriminated in price between the plaintiff and another purchaser; and (4) the effect of such discrimination may be to injure, destroy, or prevent competition to the advantage of a favored purchaser. *Dynegy*, 648 F.3d at 522 (citing *Volvo Trucks*, 546 at 176–77); *Chi. Seating Co. v. S. Karpen & Bros.*, 177 F.2d 863, 867 (7th Cir. 1949) ("[A]t least two purchases must have taken place." (quoting *Shaw's v. Wilson-Jones Co.*, 105 F.2d 331, 333 (3d Cir. 1939))); *Goodloe v. Nat'l Wholesale Co., Inc.*, 03 C 7176, 2004 WL 1631728, at *9 (N.D. Ill. July 19, 2004) (citations omitted). Alfred Angelo argues that the allegations in this case lack sufficient specificity to identify what sales and price differences

are at issue here; it further argues that transfers to its own retail stores cannot form the basis of this claim as a matter of law. Def.'s Mot. 12–13, Dkt. 49.

Much of the First Amended Complaint pertains to Alfred Angelo's policies setting minimum retail prices. The most recent series of these policies described in the First Amended Complaint set two types of minimum prices: one representing the expected retail price for online sales (the MSRP) and the other representing the minimum price for brick-and-mortar sales (the MPP). Am. Compl. ¶ 58. According to the complaint, Alfred Angelo enforced the MPP against House of Brides while eliciting agreement from other retailers to follow the pricing policies, then terminated its relationship with House of Brides for noncompliance with the pricing policies. *Id.* ¶¶ 62, 64. During this time, House of Brides contends that other Alfred Angelo distributors offered Alfred Angelo products for sale online below both the MSRP and MPP. *Id.* ¶ 63. House of Brides alleges that Alfred Angelo, too, discounted the sale of its own products below the prices set in their policies both online and in brick-and-mortar stores by way of "straight cash discounts" and "AA's Advantage Card program." *Id.* ¶ 64.

House of Brides' allegations of "different" treatment, resting on these factual allegations, fall short of stating a claim for a Robinson-Patman Act violation. If anything, the allegations that Angelo tried to enforce minimum prices across its dealer network undermine, rather than support, a price discrimination claim (selling at lower prices to some dealers would make it easier for those dealers to deviate from the minimum prices without sacrificing profit margin). That these efforts to impose minimum prices met with little success, moreover, is beside the point; whether the House of Brides competitors identified in the complaint—Dress for Less, E Bridal Superstore, Prom Save, and Plus Size Bridal—complied with those efforts says nothing

about whether they paid a different price to purchase Alfred Angelo products in any transaction, contemporaneous or otherwise. The complaint contains no such allegations, and that alone warrants dismissal of the price discrimination claim. *See, e.g., Fresh N' Pure Distribs., Inc. v. Foremost Farms USA*, 11 C 470, 2011 WL 5921450, at *3 (E.D. Wis. Nov. 28, 2011) (dismissing claim for failure to identify instances where defendant sold products to plaintiff's competitors at a lower price than that paid by plaintiff); *Monsieur Touton Selection, Ltd. v. Future Brands, LLC*, 06 Civ. 1124(SAS), 2006 WL 2192790, at *6 (S.D.N.Y. Aug. 1, 2006) (dismissing claim for failure to identify a favored purchaser or "a single allegedly discriminatory transaction"); *Goodloe*, 2004 WL 1631728, at *9 (dismissing claim in part for failure to allege "the favorable prices and terms actually granted to [the] competitors"); *Kundrat v. Chi. Bd. Options Exch.*, 01 C 7456, 2002 WL 31017808, at *7 (N.D. Ill. Sept. 6, 2002) (dismissing claim for failing to allege a second purchaser). Alfred Angelo's later refusal to sell its products to House of Brides is not a viable alternative basis for such a claim; that was simply the enforcement mechanism necessary to lend teeth to Angelo's effort to achieve uniform retail pricing. *See* 15 U.S.C. § 13(a) ("[N]othing herein contained shall prevent persons engaged in selling goods . . . from selecting their own customers in bona fide transactions and not in restraint of trade."); *B-S Steel Of Kan., Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 669 (10th Cir. 2006) (noting that a "refusal to deal" falls outside Section 2(a)'s proscriptions). This failure makes it unnecessary to address whether Alfred Angelo's subsidiary retail stores count as competitors for the purposes of a Robinson-Patman Act claim or whether any price differentials between online and brick-and-mortar distributors are justifiably procompetitive. Count V is dismissed.

### IV.     Count VII: Tortious Interference with Business Expectancy Claim

In Count VII, House of Brides asserts a claim for "tortious interference with business expectancy," alleging that Alfred Angelo has intentionally interfered with its existing and prospective customer relationships by attempting to fix a minimum price and by failing to deliver Alfred Angelo clothing for sale in House of Brides stores. Under Illinois law, a claim for tortious interference with a prospective economic advantage requires a plaintiff to prove: "(1) [a] reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511, 568 N.E.2d 870, 878 (1991); *Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007); *Hackman v. Dickerson Realtors, Inc.*, 746 F. Supp. 2d 962, 972 (N.D. Ill. 2010). For a challenged action to constitute tortious interference, Illinois law requires it to have been directed toward a third party or class of third parties with whom the expected business relationship would occur. *See Shaw*, 481 F.3d at 946 (collecting cases); *Premier Transp., Ltd. v. Nextel Commc'ns, Inc.*, 02 C 4536, 2002 WL 31507167, at *2 (N.D. Ill. Nov. 12, 2002) (collecting cases); *Hackman*, 746 F. Supp. 2d at 972; *Du Page Aviation Corp. v. Du Page Airport Auth.*, 229 Ill. App. 3d 793, 804, 594 N.E.2d 1334, 1341 (Ill. App. Ct. 1992).

Alfred Angelo argues that House of Brides has not alleged enough to plausibly suggest interference with a business relationship between the plaintiff and either specific third parties or an identifiable class of third parties, that the facts alleged do not indicate that the defendant acted toward such a third party, and that Alfred Angelo is alternatively entitled to a "competitor's

privilege" warranting dismissal. Alfred Angelo's second argument carries the motion: the First Amended Complaint does not contain sufficient allegations to plausibly suggest that Alfred Angelo directed its actions toward a third party as required for this sort of claim.

It is well established that tortious interference "must be directed toward the third party or parties with whom the plaintiff had the business expectancy—not simply toward the plaintiff." *Int'l Star Registry of Ill. v. ABC Radio Network, Inc.*, 451 F. Supp. 2d 982, 992 (N.D. Ill. 2006) (quotation marks and citation omitted). The interfering action must be "directed in the first instance at the third party." *Schuler v. Abbott Labs.*, 265 Ill. App. 3d 991, 995, 639 N.E.2d 144, 148 (Ill. App. Ct. 1993) (rejecting the argument that a defendant took action directed at third-party prospective-employer companies when it indicated to the plaintiff that it would enforce a non-competition agreement); *see also State Nat. Bank v. Academia, Inc.*, 802 S.W.2d 282, 296 (Tex. App. 1990) (applying Illinois law and requiring "some conduct directed toward a third party through which defendants purposely cause that third party not to enter into or continue a prospective contractual relationship with plaintiff"). It is insufficient for the purpose motivating the conduct to be to interfere with prospective business relations; the act itself must be directed toward the third party. *See Academia, Inc.*, 802 S.W.2d at 297 (citing *DP Service, Inc. v. AM Int'l*, 508 F. Supp. 162, 167 (N.D. Ill. 1981)). Requiring action toward third parties "prevents every breach of contract from becoming a tort claim for expectancies lost as a result of the breach." *Douglas Theater Corp. v. Chi. Title & Trust Co.*, 288 Ill. App. 3d 880, 888, 681 N.E.2d 564, 570 (Ill. App. Ct. 1997); *see also Galinski v. Kessler*, 134 Ill. App. 3d 602, 609, 480 N.E.2d 1176, 1181 (Ill. App. Ct. 1985) (distinguishing between the requirements for claims of interference with prospective economic advantage and claims of interference with contract).

House of Brides argues that the relevant class of third parties in this case consists of "current and potential customers and suppliers of [House of Brides'] wedding apparel." Pls.' Resp. 11, Dkt. 53; Am. Compl. ¶¶ 84–86. Accepting that definition of the relevant class of third parties for argument's sake, House of Brides still alleges nothing that suggests that Alfred Angelo *directed its actions toward* current or potential third-party customers or suppliers. House of Brides argues that the interference in this case was Alfred Angelo's attempt to fix prices and failure to deliver Alfred Angelo clothing for sale in House of Brides stores. That these actions had the indirect effect of interfering with House of Brides' prospective relationship with consumers who were set on Alfred Angelo products cannot be denied (based on the allegations, anyway), but that in itself is insufficient to make out this claim. According to the First Amended Complaint, Alfred Angelo attempted to fix prices by soliciting House of Brides' agreement and terminated House of Brides' status as an authorized dealer by, again, communicating with House of Brides. Alfred Angelo's actions were in this way directed toward House of Brides, not House of Brides' customers or suppliers. As Alfred Angelo points out, House of Brides fails to even argue in its Response to this Motion to Dismiss that any of its allegations suggest that actions were directed toward a third party or class of third parties. Nor does House of Brides argue that it instead intended to mount a tortious interference with contractual relations claim in this Count.

Finally, House of Brides is incorrect to assert that considering this third-party requirement is the same as impermissibly applying Illinois "fact pleading" procedural rules. The Federal Rules of Civil Procedure require a complaint to include enough factual detail to "raise a right to relief above the speculative level" and nudge the claim "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 545, 555–57, 570. Conclusory

statements do not suffice. *Iqbal*, 556 U.S. at 678 (citing *Twombly,* 550 U.S at 555). As presently constructed, the First Amended Complaint contains only general, conclusory statements in support of the tortious interference claim. Count VII is therefore dismissed, making it unnecessary to evaluate Alfred Angelo's assertion of the competitor's privilege.

*     *     *

For the reasons set forth above, the motion to dismiss counts IV, V, VI, and VII is granted. The dismissal is, however, without prejudice. While it appears doubtful, it is not beyond peradventure that the deficiencies in the First Amended Complaint cannot be remedied.

Date: January 8, 2014

_____

John J. Tharp, Jr.
United States District Judge